May it please the court, Ashford Hospitality Prime is a publicly traded corporation, not some sort of a voluntary membership association. And one of the principal tenets of corporate law is that it is the stockholders who own the corporation who get to elect the corporation's directors. And as part of that right, they have the ability and the power to nominate directors to stand for election. These rights are not disputed. They're codified in Maryland statute and in the Ashford bylaws. The key issue here is that while the company's board generally, generally its business decisions are protected from review by the business judgment rule, but the stockholders always remain the ultimate power to throw out the bums, to nominate candidates of their own does not act in accordance with the wishes of the stockholders. And in view of that fundamental right, that critically important right codified in Maryland statutes, the Maryland, Delaware and courts throughout the land have consistently held that when a board of directors goes beyond the management of the corporation and takes actions that interfere with the stockholders rights to elect the board, those decisions are not protected by the business judgment rule. The problem here is that the district court's decision throws that balance completely out of order. It completely upsets the ordinary process by which the corporation is to be governed. It effectively gives the incumbent board the power to determine who may run against them and to take any actions that it wants to take to defeat the stockholders when the stockholders want to throw them out and elect new directors. And to be able to hide behind the business judgment rule in all of those decisions. The conduct at issue in this case is as extreme, as profound, as disturbing as any I have seen in any case ever from any jurisdiction. The action here did not relate to an acquisition of stock, did not relate to a hostile takeover. This was purely a stockholder with the support of the vast majority of stockholders trying to nominate candidates for election to the board. The decision at issue was to disqualify all of them because they suspected there were plans that weren't disclosed. Why didn't they fill out the questionnaires? We did complete the questionnaires. Every single question, the district court statement to that effect that we didn't is incorrect and is not supported by the record. If you look at the questionnaires, all 430 pages are in the appendix. Every single question was answered. Now, they say the answers were not complete. They say that they asked, they did ask for all discussions between the candidates. They wanted us to produce all emails, all communications, anything reflecting our discussions. Rule 14a of the Exchange Act is adopted by reference in the bylaws. The bylaws say we have to provide in our responses all the information required by 14a. 14a does not require disclosure of plans or proposals. 14a does not require disclosure of the communications between candidates. 14a does not require the disclosure of any of the information that they say we did not produce. We did not violate the bylaws because the bylaws did not require the production of any of the information they say we did not produce. And the district court committed a clear error of law in its decision. The district court at page 9 of its decision said that the Exchange Act, the Securities Exchange Act, requires the disclosure of plans and proposals. And he cited a provision of the CFR. He cited section 13d. 13d is is not part of the proxy rules. It is not incorporated by reference into the company's bylaws. The questionnaire, we're not required, we are with respect to the SEC required to disqualify 5 percent of the company's stock. But that's a separate requirement that is not incorporated into the bylaws. The law is clear that advance notice provisions are to be narrowly construed so as not to interfere with the stockholder's right to elect directors. If the cases hold that if they completely blow off a deadline, sure, they can be disqualified. But never before has any court in this country ever condoned what these directors have done, which is to look at the questions look at the answers and say, we don't believe you. We don't believe you based on pure speculation. Now, there's something else that's very important, Your Honor. The the law of this circuit holds that when it comes to 13d, the only plans or proposals that need to be disclosed are those that are concrete. If you're having tentative discussions, inchoate plans, ideas, you're kicking around thoughts, that does not require disclosure. And this court has held that such disclosure can be misleading. If you look at the evidence relied upon by the district court, and even look at the district court's own characterizations of that evidence, which are incorrect, even under the district court's own characterizations, there was no definitive plan. What do they look at? There was never a plan produced. There was never anything. No no hiring of investment bankers, no communications with with purchasers. What we have were questions from candidates that we solicited to even if you're right about everything you've said, why isn't the issue moot? Because another panel of our court denied your stay request of the injunction. The elections were held. It's over. And so now you're basically asking us to cancel that election. But you know, this is an appeal of a the granting of a preliminary injunction, the denial of your request for preliminary injunction. I don't see where you ask below for a cancellation of the election. So explain to me why this isn't moot and why we would have the authority to nullify the election. Absolutely, Your Honor. You didn't even ask for a stay, did you? Did you ask for a cancellation? You didn't ask for a stay from the district court. We did not because we did not have time to do so. And Rule 8 specifically provides that you don't have to request a stay in the district court. If doing so would be impractical. And we cited cases in our in our Rule 8 motion on the point. We did not, with the June 10 impending meeting, we did not have time to fully brief the issue in the district court. They would have wanted time to respond, to get a decision, and then have time to bring it to the court, full briefing, and for the court to have a time to decide on the stay. And the court, and it would have been futile because the district court had decided the bidding general rule applied. Let me address the mootness issues. It is, there are two cases that are directly on point which make clear that this case is not moot. The first case is Kennecott-Copper from the Second Circuit. It's a very important case. Keep in mind, as you indicated, Judge Costa, they moved for a preliminary injunction. In our view, the district judge erroneously granted that preliminary injunction. All we are asking now is for this court in equity to require the district court to undo the damage that it has done. Kennecott-Copper was exactly the same scenario. It was a proxy contest. The plaintiff, the plaintiff was independent, prevailed in establishing that it was incorrect and should not have been granted. And the Second Circuit held that equity demanded that the results of the election be set aside and that a new election be held. It said that the current directors will remain in office until the new election is held, but a new  JUSTICE GINSBURG-MURPHY Didn't it involve federal securities laws? It was a 14a case. Your Honor, this is a 14a case, and they say we violated the bylaws by not complying with 14a. But not the federal security laws. The court, the court in Kennecott-Copper did not say, did not rely in any way on the fact that it was a federal 14a claim. It said equity demands. But a violation of the federal securities law gives the court some equitable powers. What's the basis for our equitable powers here where there's no, there's no alleged violation of the securities law. You're just saying the district court messed up. No, there are, first of all, there are securities claims in this case. In the 527 case, the first case, they have asserted securities claims against us. We have The state claims are supplemental, and those claims all are based on an alleged 14a violation. But furthermore, this court has equity jurisprudence when there are state law claims by which it exercises jurisdiction under the supplemental jurisdiction statute. You still have equity jurisdiction. The powers of this court on equity are not limited to claims that arise out of the federal securities laws or federal law, period. You have equity power. You don't need a federal court to make an equitable ruling in the first instance. I mean, typically, a district court would decide whether to exercise its equitable powers. We would review that. It's just very, very rare for us in the first instance to decide to exercise some equitable power. In the Second Circuit case in Kennecott, the Second Circuit, which deals with a lot of proxy contests, required a new election and sent it back to the district court to figure out the details. In the Ninth Circuit case in Western District Council of Lumber versus Louisiana Pacific, the Ninth Circuit did the exact same thing. In that case, the roles were switched. The movant, the party moving for a preliminary injunction, was denied a preliminary injunction. The election was held once the case was on appeal, exactly the same scenario we have here. The defendant said, whoa, whoa, whoa, they've waived their argument, it's too late. They didn't ask the district court to undo the results of the election. And the Ninth Circuit rejected the argument. The Ninth Circuit said, no, we have the power to undo the election if it was tainted by a violation of 14A. We have the power to do so. And the fact that the election was held is of no consequence because the election wasn't held until this case was on appeal. Of course the plaintiff couldn't have asked the district judge to set aside the election had not occurred. That's the same situation we have. We filed our notice of appeal in late May. The case was up here when they decided to proceed with the election. The company could have rescheduled it or moved it. They proceeded with the election, with the appeal pending, on June 10, once we were already on appeal. So could we have dismissed the appeal and gone back? Sure, but we'd be tied up for years waiting around to get to this court. That's what they want. And we'd be tied up in knots. Keep in mind, the question presented here is purely a question of law, or principally a question of law. Does the business judgment rule apply under Maryland law? And if so, did the judge apply that law correctly, or did he ignore the evidence of bad faith and prejudice and effectively commit an error of law by not considering the right evidence, and by ignoring the cases which hold that they cannot discriminate or apply the advance notice provisions inequitably? Those are questions of law. This is not a fact-bound case where we're going to send it back and it depends on the facts. Without a determination of that issue of law by this Court, we are wasting our time and our money and the Court's time below. So on your merits legal issue, as you describe it, of the business judgment rule, what Maryland case that actually involved an election says the business judge did not apply the business judgment rule? Well, the Shaker v. Foxbee case involved an election and it involved the use of the business judgment rule against the stockholder nominee is exactly the situation we have in this case. Now, that was a trial court decision by a well-regarded judge who has since become a member of the Special Court of Appeals, and it was reported under Maryland law in an online database where cases are selected for publication from the trial courts. But Shaker v. Foxbee is directly on point. It was followed by the district court in Maryland, the Shaker case, which is the Maryland Court of Appeals decision that the district judge relied upon. And that case is critically important because the questions are related. In that case, the question was about direct versus derivative claims. And the Court did a very long and elaborate and very careful explanation of the law. And what the Court said was this. When the claim is derivative, they do a bad deal or something like that. The claim is derivative. You must go through the formalities of a derivative claim, making notice and demand on the corporation, and their decision is shielded by the business judgment rule, absent evidence of bad faith or self-interest and so on, or lack of informed decision-making. Then the Court went on to say, but when the rights of the stockholders are affected directly, and it specifically mentioned interference with their right to vote or to seek an accounting, when there is something that goes directly to the rights of the stockholders, there's no need to go through the derivative process. You may bring the claim directly, and the decision is not protected by the business judgment rule. That may be dicta. It may be dicta. But it is dicta from the state's highest court. The law of this circuit is that even dicta from the state's highest court is powerful evidence in predicting what that court will do. Importantly, Your Honor, they cite no case from any jurisdiction ever, published or unpublished, high court or low court, not even a single trial court decision from any jurisdiction that has ever held that when the directors of a company interfere with the right of the stockholders to vote, that they are shielded by the business judgment rule. If you look at their briefs, there isn't a single case. What they asked this court to do is extraordinary. What they got the district judge to do was extraordinary. They heralded it on their, on Cadwalder's website. The first time ever something like this has ever happened. Well, just a few months before Schenker, just a few months before that dicta in Schenker, the same Maryland court had that U.S. Naval Academy Association case, and that was an election issue, and they rejected the Delaware standard. Your Honor, it wasn't a corporation. There were no stockholders. It was the Alumni Association of the Naval Academy. It didn't have stockholders. There are no owners. But they rejected Blosius. They did not. If you look at the decision, they said there was no interference with members voting. How can a case that doesn't involve stockholders, where the organization has no owners, how can that involve the same issues as a case with stockholders where we own the corporation, or we're supposed to own the corporation anyway? Their reliance on that case speaks volumes. The only case they can come up with is an association, a non-stock association, an alumni association? We often have the experience of sitting on a corporate, of non-profit boards where the directors elect themselves. That is not the way it is in a public corporation. All right. You saved some time for rebuttal, during which I would like you to address my question as to you've claimed equitable relief under the Maryland law. I don't see anything where you're relying on a violation of federal security. So if you would look at the pleadings and let me know where that allegation was made, where that claim was made. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Martin Seidel from Kedwalader, Wickersham and Taft on behalf of the Ashford Hospitality Prime Defendants. With me here today is my colleague Jared Stanise, my co-counsel from Andrews and Kurth, Matthew Nielsen, and counsel for the Ashford, Inc. Defendants, Thomas Allen from the Jones Day Firm. By agreement of the parties, since the issues are all interrelated, I'm going to be presenting on behalf of all of the appellees today, Your Honors. Appellants ask this Court to accord no deference to the Court below, the legislature and courts of Maryland, or the decisions of the Board of Directors of Ashford Prime, in support of their request that they be granted relief that they not only never sought but chose to reject and refuse below. Appellants raise one and only one error of law. Otherwise, they ask this Court to reweigh the evidentiary findings of the Court below. They do not, as they must, show any abuse of discretion in the grant of a preliminary injunction, which is left to the sound discretion of the district court. They do not, as they must, show a clear error in any of Judge Godbee's factual findings. Indeed, they never once mention in their opening brief that the standard for review of injunctive reliefs is abuse of discretion. They never once mention that the review of factual findings on an appellate decision is clear error. And they attempt to recast the factual findings as errors of law. But that doesn't change the fact that the only legal issue they raise on appeal is whether or not it was appropriate to apply the business judgment rule to the decision of the Board of Ashford Prime to reject the advance notice submission by the SESA defendants. Now, I'd like to start with the question related to mootness that you asked to Mr. Summers here about the Kennecott-Copper case. First, Kennecott-Copper, unlike this case, was a case involving violations of Federal antitrust laws and Federal proxy laws. With the Court's indulgence, I'd like to explain some of the background of that case that's left out of SESA's briefs and was left out of Mr. Summers' presentation. In that case, Curtis Wright sought to solicit proxies for the shareholder annual meeting for the Kennecott-Copper Corporation. As is often the case, both sides in this hostile takeover by proxy fight filed suit against one another under the Federal securities laws and under the antitrust laws. On the eve of the May 2, 1978, Board meeting, on May 1, the District Court entered an injunction enjoining Curtis Wright from voting any of its proxies at the annual meeting. That night, Curtis Wright filed a motion for a stay pending appeal, having failed to obtain one from the District Court as required by Rule 8. They then went to the Second Circuit and asked for a stay pending appeal. The entire stay motion was fully briefed and That stay was granted, but the stay only applied to the voting of the shares by Kennecott, the solicited proxies, I'm sorry, by Curtis Wright, excuse me. So Curtis Wright was now allowed to vote its proxies at the May 2nd annual meeting. The meeting went off, Curtis Wright lost, the appeal proceeded. If you look at the Court's decision in Kennecott, the reason that it reversed and the reason that it ordered a retrospective rescission of the electoral results was because having permitted the circuit court, having permitted the meeting to go forward, caused harm to Curtis Wright because the May 1 decision, and this is in the Court's opinion, savaged Curtis Wright. It was very critical of Curtis Wright, and the circuit court's decision coupled with its own stay of the decision below harmed Curtis Wright, and that having now found that Curtis Wright had not in fact violated the federal securities laws, equity demanded that the circuit court undo by rescinding the election the damage the circuit court had caused to Curtis Wright. None of those facts are present here. On May 20th, 2016, Judge Godbee issued a well-reasoned decision after argument in joining CESA under the proxy rules. CESA did not immediately seek a stay of the meeting from the district court. It didn't seek an injunction or stay of the meeting from this court. Instead, it did what it had been doing all along. It had chosen from the beginning of the case to proceed only to fight off Ashford's motion for an injunction under the bylaws and to seek its own injunction under the Third Amended and Restated Advisory Agreement, ordering the Ashford board mandatorily to approve CESA's candidates for purpose of that agreement to waive the termination fee in its agreement with Ashford, Inc. When asked by the district court at argument whether or not the court, that court should move the meeting, Mr. Summers replied And this is at page 16-10671.4200 of the record. Can you? Yes. Should you? No. And he then explained all of the reasons why CESA believed that the June 10th meeting should be held to go forward. He then continued, I don't think, I don't think it is either. But I think, unfortunately, you know, there's sort of, this is the world of big boys and we would prefer to have an order from the court moving forward with the June 10th meeting. When we, the Ashford parties, offered to adjourn the meeting after the hearing, we were publicly rejected by CESA. This puts this case squarely within Harris v. Houston. The question of mootness or waiver here is governed entirely, not by the Second Circuit's decision in Kennecott, which is unique to that case, not by the Ninth Circuit's decision in Louisiana Pacific, but by the Fifth Circuit's decision, by this panel's decision in Harris v. Houston. There the court made clear that when a party picks a strategy sought below, when it is the architect of its own misfortune, this court is not going to exercise equity to give it relief. It not only never sought below, but positively reject, chose not to seek below. On the merits of the issue, if we reach that, how do you respond to the other side's argument that you're relying on the business judgment rules application in Maryland in this context on, I think, the Naval Academy case, the NAACP case, neither of which have shareholders, he points out. How do you respond to that? Well, Your Honor, I would direct your attention first to the actual statute, to the text of the statute itself. I think we should start there in our analysis of what rule Maryland seeks to apply to board decisions. And if you look at 205, 2-405.1a, that lays out the rule, and neither party disagrees with that. If you look, most of the fight has been over whether or not the carve-out, the UNICAL carve-out in F, which is what the subject of Schenker, the Schenker decision and the recent amendments is, would apply to this case. And whether it does or doesn't, you need to look at section C of the statute and the plain language of that section, which says an act of a director of a corporation is presumed to satisfy the standards of subsection A of this section. That's part of the 1999 amendments to section 405. And I'll repeat that. An act of a director of a corporation, an act, not a managerial act, not an act that's not about shareholder voting, an act of a section, meaning the codified business judgment rule standard. Taken together, A and C are the business judgment rule presumptions. The Maryland legislature has clearly spoken. When a director acts, the course of their action is to be judged by the court in accordance with the presumptions of the business judgment rule, period, full stop. Schenker and Shaker v. Foxbee, as you pointed out, Judge Costa, are both cases involving standing, not standards. While Schenker talks about the Revlon duties and talks about generalized duties and common law duties in different places, both cases are purely cases about direct versus derivative standing. The same is true for Shaker as it is for Schenker. In fact, if you look at the standard, at the very end of the case, the court says very clearly, we don't decide what standard, what standard was or wasn't met here. This is just about who can sue. Is, does, do F and G, which purport to foreclose direct actions, really foreclose direct actions? Why does it make sense, though, to apply the business judgment rule? I mean, in the typical managerial context, it makes a lot of sense. It's well established. You want to give that deference. But when you're talking about elections, there's such a self-interestedness among the board that they're going to protect themselves. Given that conflict, why does it make sense to defer to the board on an election matter? Well, first of all, because that's what Maryland has told us to do. But second, because the alternative to doing that, the alternative that's been understood and created in Maryland, I mean, in Delaware, is the UNICAL test. And the UNICAL test is a two-pronged test, and it's a shifting, it both creates a test and shifts the burden. Rather than placing on the plaintiff the burden of establishing that they, sufficient evidence to overcome the business judgment rule, UNICAL shifts the burden to the directors to establish that the corporation faced a threat with respect to a defensive measure and that the response of the board was reasonable in response to that threat. Now, if you look at Judge Godby's decision below, even under UNICAL, we would have prevailed. What Judge Godby says at pages 9 and 10 of the order is that the board reasonably could believe that no party would engage highly sophisticated counsel and spend millions, if not tens of millions of dollars, to wage a proxy fight if they did not have plans for the company. What were they going to do on June 11th? Once it was reasonable for the It was reasonable. Now, Judge Godby uses the word rational, but what he could as easily have said is it was reasonable at that stage for the board to respond by invalidating SES's slate, by refusing to permit them to stand for election. And this is not a case about a board choosing its opponents. It's about a board enforcing rules that it put in place years before this case came up, which is why it's different than the New Germany case that SES cites. New Germany is the more typical case you see in the proxy contest world, and that's where there are no provisions. There are no rules. And suddenly a slate, you find out someone is going to bring a proxy fight against you, and all of a sudden the board enacts a set of bylaws that make it impossible. Frankly, that's what Shaker was as well. Shaker was the use of a, the structuring of vacancies on a board in a way to make it impossible for somebody to bring a proxy fight. The way in which the advance notice bylaw was coupled with the timing of the creation of board seats was designed to thwart a proxy challenge, and it happened only after the company in Shaker recognized that it was under threat. And in those circumstances, entrenchment does appear to be a motive. But here what you have is a longstanding bylaw. It was, we sent them a questionnaire. We asked them to comply with the bylaws. And contrary to what Mr. Summers has said, the federal securities laws are incorporated in full into the advance notice bylaws. Compliance with all aspects of the federal securities laws are a requirement of the advance notice provisions. So a violation of the disclosure provisions with respect to plans is equally a part of the advance notice. Voting in a voluntary association and voting in a corporation is a distinction here without a difference. Courts routinely apply the corporate governance standards applicable to boards of public companies, to boards of private companies, and to boards of nonprofit companies. So TACNY and the NAACP case apply with equal force here. Now, Mr. Summers has said that no board has ever applied the substantive provisions of its advance notice bylaws in a decided case to invalidate a slate, and he's right. But that's because no board has ever been faced, to our knowledge, or at least in any reported decision we're aware of, with a candidate, a proxy candidate, who having refused to answer questions under the bylaws, and having been given a chance, having been sent a letter offering a second chance to follow up, instead answers with what amount to the objections and responses you would typically see from an overzealous lawyer in response to document and interrogatory requests and civil discovery. Having received that letter and having been invited by the nomination and governance committee of this board to sit for interviews, not only did CESA refuse the interviews, but as discovery bore out, didn't even bother to tell its own This is a clear case in which CESA chose to flout the bylaws. It was their strategy from the beginning. For whatever reason, Judge Godby asked them, the same question you asked Judge Clement, why don't you just answer the questions in the questionnaire? And Godby went further and said, you're handing them this issue on a silver platter. Even then they wouldn't supplement. They wouldn't find a way to provide the answers. While those would have been out of time, they wouldn't do it then. They repeatedly, they never sought to enjoin the meeting. When offered delays of the meeting, they refused them. When they lost at the district court, only then on their appeal, and never to the district court, did they seek a stay pending appeal. When another panel of this court denied it, for the first time they started asking for retrospective relief. Retrospective rescission of an election. And another thing that you can see in Kennecott is, Kennecott makes clear that retrospective relief of that sort is rare, in fact unprecedented. And that's because the Supreme Court in Mills v. Electric Autolite made it clear that retrospectively undoing an election of directors, unscrambling the eggs, as the Supreme Court put it in that case, a phrase we've all heard many, many times since, is something courts can only do in extraordinary circumstances. Those circumstances don't exist here, and these parties through their conduct, the SESA parties through their litigation tactics and conduct, have waived any right to that extraordinary relief. The Court has no further questions. All right. Thank you, sir. We have the argument. Mr. Summers. Judge Clement, first, to answer your question, I would direct the Court to count six of SESA's amended answer and counterclaims in the 527 case. It's at Record of Appeal 1610671.1073-74. We alleged a 14A claim. On the issue of mootness, a couple of additional points. There is a pending motion for contempt against us. They say we have violated the preliminary injunction by issuing press releases after the date of the annual meeting, because the third prong of the district court's preliminary injunction order does not refer to the annual meeting. It forbids us from soliciting proxies or any materials about our candidates, and it does not limit it by time or to the annual meeting, according, and they have filed a contempt motion that's pending now on the basis of that. This appeal, there's, we've cited the law in our briefs on this issue. There's Fifth Circuit law holding that an appeal is not moot when there's a pending contempt motion pending. Also, this is a classic case. It's pending in the district court, Your Honor. Correct. There is also, there's also, this is a classic case for the capable of repetition yet evading review exception, which was not, which was clearly inapplicable in all of the cases they cited, including Harris. Here we have an election issue which the court has held as a classic case. This, this is going to come up again. This is not the first act of entrenchment. They adopted the proxy penalty last summer. They adopted the proxy put. They tried to issue themselves preferred stock for a penny a share in January, which the New York Stock Exchange ultimately forced them to withdraw on pain of delisting. There is a pattern of entrenchment by this Board that is unmatched in the, in the annals of corporate law. Mr. Seidel wants to turn it into just this disqualification. The disqualification was the final last step when they saw that all of their other acts of entrenchment were failing. They have proxy solicitors. They knew that the stockholders were going to throw them out of office. Look at the, the results of the election. Two-thirds of the stockholders, deprived of any choice of candidates, exercised their only remaining option. What was that? To vote to withhold support, to withhold their proxies from the incumbent Board. It has never happened before to our knowledge in the history of publicly traded corporations. Two-thirds of the stockholders said, are screaming for help. This goes right to the equities. It goes right to the question whether an election should be held again. This, there's nothing to unscramble here for an election to be re-held. Under Maryland law, and I can cite it to the court, and under the Ashford Prime bylaws, the incumbent directors remain in office as holdovers until a new election is held. None of their decisions will be challenged. It's very simple for I said in the district court, when we had an argument in front of the district court, we never, the judge never said that he was going to allow the election to go forward without us participating and under the threat of the proxy penalty. The judge was saying two different things. First, he said, should we reset the election and you guys can start all over and have new proxy solicitations? And I said, no. Why? Because we fully disclosed everything. The stockholders are fully aware of what everybody wants here, that they want to remain in power and we want to look at everything. We want good corporate governance. We want to consider sales of, consider a sale of the company. But keep in mind, when we submitted our nomination materials, it was January. The election wasn't even held in June. How can we have a definitive plan to do something with the company six months in advance when we don't have the information the board has? We were urging them all along. We had meetings with them. We sent them letters. We filed the letters with the SEC. In the letters we filed with the SEC under 13D, we said that we believed that the preferred alternative would be a sale of the company. We said in our 14A submissions we would consider all options, including sales of the company or its assets, renegotiating the terms. All of these things were fully disclosed. We told them. They rely on our statements to them. This is a trivial technical thing about it not being in the questionnaire. We had meetings with them right before we submitted the questionnaire. They rely on them in their briefs. So why didn't you put it in the questionnaire? The individuals were given five days to submit their questionnaires because they sat around scurrious fear. Well, they knew what to say if they'd already said it. Your Honor, and we did. We incorporated all of our SEC filings by reference. The law is clear in Delaware and Maryland. Advanced notice provisions are not supposed to be used inequitably or in a discriminatory way to frustrate the right of the stockholders to elect candidates of their own choosing. And that's exactly what they did here. Their proxy fighting specialist, their investment banker, met with us and said that they had a strategy to declare us invalid. That was on March 24th before they ever supposedly made the decision. There's no strategy here to flout the bylaws. We were forthcoming about our views. They weren't definitive plans that required disclosure either under the bylaws or under the federal securities laws. And by the way, Mr. Seidel said to this Court that the bylaws required disclosure of everything required by the Exchange Act. Please look at the record. Everything he said about the record was false. And that should be the test of his credibility. They repeatedly mischaracterized the facts and the law to the district court, and they succeeded. And they're trying to do it again. And I pray and ask this Court to look at the bylaws, which are contained at tab 8 of our record of appeal, and it refers to Section 14a and nothing else. All right. Thank you.